## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY<br>1411 K Street NW, Suite 1300<br>Washington, DC 20005,<br><br>   Plaintiff,<br><br> v.<br><br>DOUG BURGUM, in his official capacity as<br>Secretary of the U.S. Department of the<br>Interior, 1849 C Street NW<br>Washington, DC 20240,<br><br>BRIAN NESVIK, in his official capacity as<br>Director of the U.S. Fish and Wildlife<br>Service, 1849 C Street NW<br>Washington, DC 20240,<br><br>U.S. FISH AND WILDLIFE SERVICE,<br>1849 C Street NW<br>Washington, DC 20240,<br><br>   Defendants. | Case No._____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. Plaintiff Center for Biological Diversity ("Center") challenges the U.S. Fish and Wildlife Service's ("Service") unlawful decision to deny Endangered Species Act ("ESA") protections to the Florida pinesnake (*Pituophis melanoleucus mugitis*) ("pinesnake"). 16 U.S.C. §§ 1531–1544; Seven Species Not Warranted for Listing as Endangered or Threatened Species, 88 Fed. Reg. 83,368 (Nov. 29, 2023). The Service violated the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, 701 *et seq.*, when it found that listing the pinesnake as

1

an endangered or threatened species is "not warranted," thereby depriving the species of critical

protections that are necessary for its survival and recovery.

2.      The pinesnake is a large, harmless, constrictor snake that lives in the dry, sandy,

open-canopied longleaf pine ecosystems of the southeastern United States. The pinesnake spends

much of its time underground, occupying burrows excavated by other species or using its spade-

shaped head to dig.

3.      The pinesnake is highly imperiled because the fire-dependent longleaf pine

ecosystems that provide essential habitat for the species have faced such extensive destruction

that only about 3% remain in natural condition. Urbanization, road construction, and fire

suppression continue to destroy and fragment this habitat. Road mortality, invasive species,

disease, and climate impacts from sea level rise, increased drought, more intense storms, and

altered fire seasons also threaten the pinesnake.

4.      Recognizing the species' continued decline, in July 2012 the Center petitioned the

Service to list the pinesnake as endangered or threatened under the ESA. In September 2015, the

Service concluded that the Center's petition presented substantial information indicating that

listing the pinesnake may be warranted.

5.      Despite its own analysis indicating that the pinesnake faces myriad threats and

will continue to decline across its range, the Service found on November 29, 2023 that ESA

protections for the species are "not warranted." 88 Fed. Reg. at 83,368.

6.      The Service's not-warranted determination violates the ESA and is arbitrary and

capricious, in violation of the APA, because it (1) defines pinesnake populations by delineating

"populations" that are permanently divided by highways—contrary to the best available science

and the Service's own findings showing that highways are barriers to pinesnake movement and

isolate snakes from one another; (2) fails to analyze the impacts of myriad threats to the pinesnake identified by the best available science and the Service itself; and (3) contradicts the Service's own definition of a resilient population and the best available science by hinging a population's resilience on the mere probability that a *single* pinesnake is present in an area.

7.      Furthermore, the Service's analysis of whether the pinesnake is endangered or threatened in a "significant portion" of its range arbitrarily contradicted its own findings about the significance of several portions of the pinesnake's range that will be extirpated in the foreseeable future. The Service's finding that those portions of the pinesnake's range are not "significant" is further unlawful insofar as its test for significance relied solely upon an unlawful interpretation of the ESA.

8.      To remedy these violations, the Center seeks an order declaring that the Service's not-warranted finding is unlawful, vacating the not-warranted finding, and remanding the matter to the Service to issue a new, lawful finding regarding whether the Florida pinesnake warrants protection under the ESA as an endangered or threatened species by a date certain.

## JURISDICTION AND VENUE

9.      The Center brings this action pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), and the Administrative Procedure Act, 5 U.S.C. § 702, which waive Defendants' sovereign immunity.

10.     This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c) (district court jurisdiction) and (g)(1)(C) (action arising under ESA citizen-suit provision); 5 U.S.C. §§ 702, 704 (APA); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201 (declaratory judgment); and 28 U.S.C. § 1346 (United States as defendant).

11.     The court may grant the relief requested under the ESA, 16 U.S.C. § 1540(g); the

APA, 5 U.S.C. §§ 702–706; and 28 U.S.C. §§ 2201–2202 (declaratory and injunctive relief).

12.     As required by the ESA citizen-suit provision, 16 U.S.C. § 1540(g)(2)(C), the

Center provided the Secretary of the U.S. Department of the Interior and the Director of the

Service with written notice of its intent to sue for ESA violations on March 24, 2025, more than

sixty days prior to the filing of this complaint.

13.     Because Defendants have not remedied their violations of law, there exists an

actual controversy between the parties within the meaning of the Declaratory Judgment Act. 28

U.S.C. § 2201.

14.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e) and

16 U.S.C. § 1540(g)(3)(A) because this civil action is brought against an agency of the United

States and against officers and employees of the United States acting in their official capacities

under the color of legal authority. Furthermore, no real property is involved in this action, and

the Department of the Interior and the U.S. Fish and Wildlife Service are headquartered in this

district. The Center also maintains an office in this judicial district.

## PARTIES

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national, non-profit

conservation organization that works through science, law, and the creative media to protect

endangered species and their habitats, including the Florida pinesnake. The Center has more than

93,000 members, including many who live and recreate in the pinesnake's range. The Center is

headquartered in Tucson, Arizona, with offices throughout the United States.

16.     The Center brings this action on behalf of its staff and members, who derive

recreational, aesthetic, educational, scientific, professional, and other benefits from the pinesnake

and its habitat. The interests of the Center's members in protecting and recovering the pinesnake and its habitat are directly harmed by the Service's failure to comply with the ESA and APA in making a listing determination for the pinesnake.

17.    For example, Center member George Heinrich is a professional biologist and environmental educator living in St. Petersburg, Florida, who saw his first Florida pinesnake in 1988. Mr. Heinrich hikes the nearby Brooksville Ridge every fall with the goal of seeing a pinesnake and he plans to hike the Brooksville Ridge again in the fall of 2025. Mr. Heinrich owns and operates Heinrich Ecological Services, which provides wildlife survey and research services, weeklong herpetology camps in the summer, and hikes and nature tours in the fall. In the summer herpetology camps, Mr. Heinrich teaches children about Florida pinesnakes and other reptiles of the Florida uplands by leading hikes to see pinesnakes in their natural habitat and showing videos and photos of pinesnakes. For the fall hikes and nature tours, Mr. Heinrich leads individuals, organizations, and school groups to upland habitat in Florida with the goal of finding pinesnakes. Mr. Heinrich plans to lead the herpetology camps throughout the summer of 2025 and to lead hikes and nature tours in the fall. The Service's failure to protect the Florida pinesnake harms Mr. Heinrich's recreational and professional interests in the species because as pinesnakes continue to disappear from the wild, it is becoming more difficult to search for them while hiking, take clients on hikes to see them, and teach about their wild existence.

18.    Center member Kurt Buhlmann is a conservation ecologist and senior research associate at the University of Georgia's Savannah River Ecology Laboratory ("SREL"), a conservation site located at the U.S. Department of Energy's Savannah River Site. Mr. Buhlmann works with reptiles and amphibians in Florida pinesnake habitat, and the Service's failure to protect the pinesnake harms Mr. Buhlmann's professional interests in conserving that habitat. Mr.

Buhlmann searches for Florida pinesnakes during field visits at the SREL every other month and at the Aiken Gopher Tortoise Heritage Preserve at least once a month, both of which are in South Carolina. Mr. Buhlmann plans to visit the SREL bimonthly and the Aiken Gopher Tortoise Heritage Preserve at least monthly for the rest of 2025. Mr. Buhlmann's recreational interests in looking for and photographing Florida pinesnakes while hiking and backpacking in pinesnake habitat are also harmed by the Service's failure to protect the species. A South Carolina resident, Mr. Buhlmann also searches for Florida pinesnakes every week as he drives on roads near pinesnake habitat.

19.     The Service's decision to deny ESA protections to the pinesnake has caused the Center's members, including Mr. Heinrich and Mr. Buhlmann, to suffer concrete and particularized injuries that are actual and imminent. Without the protections provided by listing the pinesnake as an endangered or threatened species pursuant to the ESA, the species will likely continue to decline towards extinction, and the Center and its members will continue to suffer injury unless the relief sought in this complaint is granted.

20.     Given the significant scientific evidence showing the Florida pinesnake is at risk of extinction, a court order remanding the not-warranted finding to the Service with instructions to make a new finding by a date certain that complies with the ESA and APA will result in protections for the Florida pinesnake, which would redress Plaintiffs' injuries.

21.     Defendant DOUG BURGUM is the Secretary of the Interior ("Secretary") and has the ultimate responsibility to administer and implement the provisions of the ESA regarding the pinesnake, and to comply with all other federal laws applicable to the U.S. Department of the Interior. Plaintiff sues Defendant Burgum in his official capacity.

22.     Defendant BRIAN NESVIK is the Director of the U.S. Fish and Wildlife Service and is charged with ensuring agency decisions comply with the law. Plaintiff sues Defendant Nesvik in his official capacity.

23.     Defendant U.S. FISH AND WILDLIFE SERVICE is a federal agency within the Department of the Interior. The Secretary of the Interior has delegated to the Service the authority to administer the ESA for non-marine species and the duty to comply with all applicable federal laws. 50 C.F.R. § 402.01(b). This authority and duty encompasses findings and proposed and final listing determinations for the pinesnake.

### STATUTORY AND REGULATORY BACKGROUND

**The Endangered Species Act**

24.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). "[T]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id*. at 174.

25.     The ESA protects and recovers species that the Service has determined to be "endangered" or "threatened." 16 U.S.C. § 1533(a).

26.     A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

27.     A species' status "throughout all" of its range and in a "significant portion of its range" are independent bases for listing that species as endangered or threatened. As a result, the Service cannot require that a portion of a species' range be so significant that being endangered

or threatened in that portion of its range would be "functionally equivalent" to being endangered or threatened throughout its range. *Desert Survivors v. U.S. Dep't of the Interior*, 321 F. Supp. 3d 1011, 1070-71 (N.D. Cal. 2018).

28.    In making a listing determination for a species, the Service must consider five statutory listing criteria: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1).

29.    If a species meets the definition of threatened or endangered because it is imperiled by any one or a combination of these five factors, the Service must list the species. *Id.* § 1533(b)(1)(A); 50 C.F.R. § 424.11(c).

30.    The Service must base all listing determinations "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

31.    A species receives numerous substantive protections once the Service lists it. For example, section 7 of the ESA requires all federal agencies to ensure that their actions do not "jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of a listed species' "critical habitat." *Id.* § 1536(a)(2). Section 9 of the ESA prohibits, among other things, "any person" from intentionally or incidentally "taking" listed species without a lawful authorization from the Service. *Id.* §§ 1538(a)(1)(B), 1539. Other provisions require the Service to designate "critical habitat" for listed species, *id.* § 1533(a)(3); instruct the Service to "develop and implement" recovery plans for listed species, *id.* § 1533(f); and authorize the Service to make federal funds available to states to assist their efforts to preserve and protect threatened and endangered species. *Id.* § 1535(d).

32.     Any interested person can petition the Service to add a species to the Service's formal list of threatened and endangered species. *Id.* § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

33.     The Service must make a preliminary finding on the petition within 90 days of receiving the petition. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). If the Service finds "substantial information indicating that the petitioned action may be warranted," it must publish that finding and proceed to conduct a full scientific review of the species' status. 16 U.S.C. § 1533(b)(3)(A).

34.     Upon completing the status review, and within 12 months of receiving the petition, the Service must publish one of three findings (known as a "12-month finding"): (1) listing is "warranted"; (2) listing is "not warranted"; or (3) listing is "warranted but precluded" by other proposals for listing species. *Id*. § 1533(b)(3)(B).

35.     If the Service issues a finding that listing the species is "warranted," it must publish a proposed rule to list the species as endangered or threatened in the Federal Register. *Id*. § 1533(b)(5). Within one year of publishing a proposed rule to list a species, the Service must issue a final rule listing the species and designating critical habitat, unless the Service finds that there is substantial disagreement regarding the sufficiency of the available data or that there is not sufficient evidence to justify the proposed action. *Id*. § 1533(a)(3), (b)(6)(A)–(C).

36.     If the Service issues a finding that listing the species is "not warranted," that finding is a final agency action subject to judicial review. *Id*. § 1533(b)(3)(C)(ii).

**The Administrative Procedure Act**

37.     While the ESA provides for judicial review of "not warranted" findings, *id.* U.S.C. § 1540(g), the APA provides the standard of review, 5 U.S.C. §§ 701–706.

38.     Under the APA's standard of review, a court must hold unlawful and set aside "agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

39.     An agency's action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

40.     When considering facts within the agency's expertise, "although [a] Court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts." *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 685 (D.D.C. 1997).

## **BACKGROUND**

### I.     **The Florida Pinesnake and the Best Available Science on Threats to Its Existence**

41.     The Florida pinesnake, pictured below, is a large, heavy snake that grows to an average of four to six and a half feet long. The species lives primarily in dry, upland areas with well-drained, sandy soils, especially in the longleaf pine ecosystems of the southeastern United States, from southern South Carolina to Georgia, Florida, and eastern Alabama. The Florida pinesnake spends most of its time underground, using its specialized spade-like head to dig. It also takes shelter in gopher tortoise burrows, stump holes, and mammal burrows, especially the burrows of southeastern pocket gophers.



Fig. 1: A Florida pinesnake. Credit: Glen Bartolotti

42.     One of the greatest threats to the pinesnake's continued existence is the ongoing destruction of the longleaf pine ecosystems that provide essential habitat for the species. Longleaf pine uplands once covered an estimated 92 million acres throughout the southeastern United States, but agriculture, urban development, and intense logging have all destroyed and degraded these forests. Longleaf pine communities need frequent fires, which historically occurred approximately every two to five years, to create their open-canopy ecosystems, but landowners past and present have practiced fire suppression, and use of prescribed fire has been increasingly limited due to urbanization. Consequently, today only about 3% of historic longleaf pine communities are in relatively natural condition.

43.     As a result of the destruction of longleaf pine ecosystems, habitat fragmentation— the breaking apart of contiguous habitat into many separate patches—also threatens the pinesnake. The pinesnake requires a large home range to meet its resource needs and cannot thrive in small patches of habitat. But urban development and roads continue to break up the pinesnake's ecosystem, isolating populations, limiting access to mates, and exposing the pinesnake to more direct and indirect mortality through human encounters. With many of the

species' remaining populations small and isolated, they are more vulnerable to extirpation generally and to the effects of stochastic and demographic events such as severe weather and years of low reproduction.

44.    Roads also pose a significant threat to Florida pinesnakes because cars often kill individuals as they try to traverse roads. Pinesnakes' slowness, large size, and daytime activity patterns may make them especially vulnerable to being killed by cars, and some drivers intentionally target pinesnakes because they mistakenly think they are dangerous. High numbers of dead pinesnakes have been observed on roads; of 108 records of pinesnakes on roads collected by the Florida Fish and Wildlife Conservation Commission through 2016, 41% were of dead snakes. Existing research indicates that road mortality can have significant population-level effects on snake species.

45.    Aggressive, invasive fire ants from South America have spread throughout the pinesnake's range, are known to prey on reptile eggs and young snakes, and can infiltrate and dominate pinesnake habitat.

46.    Feral hogs are also known to directly kill reptiles, disturb the soil, and destroy habitat the pinesnake relies on. Many of the largest feral hog populations in the United States occur in the pinesnake's range.

47.    Persecution and harassment from humans also threaten the species. Superficial similarities to rattlesnakes have resulted in humans killing pinesnakes, and pet-trade collection has contributed to population declines in the past. Despite some state-level regulations, there is still persistent demand for pinesnakes among reptile collectors.

48.    Disease and parasites are a threat to the pinesnake as well. A fungal disease, ophidiomycosis, has been discovered in Florida pinesnake populations and has contributed to

widespread mortality among snake populations across the eastern United States. Further, the invasive parasite *Raillietiella orientalis* has infected and killed snakes within the pinesnake's range and appears to be spreading.

49.     Climate change threatens the pinesnake as more frequent drought, increased flooding, and more intense storms damage pinesnake habitat and restrict use of prescribed fire to restore and manage this habitat. Further, many coastal pinesnake populations are highly vulnerable to sea level rise.

50.     Cogongrass, considered one of the worst invasive weeds in the world, already occurs throughout the pinesnake's range and spreads rapidly, displacing native ecosystems and destroying the pinesnake's habitat.

51.     As threats to the species continue unabated, the pinesnake continues to suffer declines across its range and, according to the Service, nearly a third of its populations have already been extirpated.

## II.     The Center's Petition and Listing History

52.     In response to the decline of the Florida pinesnake, the Center petitioned the Service to list the species as threatened or endangered under the ESA on July 11, 2012.

53.     More than three years later, long after the Service's preliminary 90-day finding was due, the Service published a finding that protection under the ESA may be warranted for the pinesnake. 90-Day Findings on 25 Petitions, 80 Fed. Reg. 56423 (Sept. 18, 2015).

54.     In 2020, the Center filed a lawsuit challenging the Service's failure to produce a 12-month finding on its petition for the pinesnake.

## III.    The Service's Unlawful Not Warranted Finding

55.    Despite the pinesnake's precarious state and the numerous threats it faces, in November 2023, the Service published a 12-month finding that the pinesnake did not warrant listing as an endangered or threatened species under the ESA. 88 Fed. Reg. at 83,368.

56.    The Service's not-warranted finding was primarily based on a Species Status Assessment ("SSA") the Service completed in July 2022. U.S. Fish and Wildlife Serv., *Species Status Assessment Report for the Florida Pinesnake* (Pituophis melanoleucus mugitus), Version 1.1 (July 2022) [hereinafter "SSA"], and a subsequent Species Assessment Form ("SAF"). U.S. Fish and Wildlife Serv., *Species Assessment and Listing Priority Assignment Form* (June 21, 2023) [hereinafter "SAF"]. The Service characterizes the SSA as the "biological underpinning" of the not-warranted finding and as a compilation of the best available data regarding the pinesnake's biology and factors that influence its viability. SSA at 1. Unlike the SSA, which is not a decision document and does not result in a recommendation regarding whether the pinesnake warrants listing as an endangered or threatened species, the SAF is a decision document that incorporates information from the SSA and concludes with the Service's "finding" as to whether the species is threatened or endangered in all or a significant portion of its range.

57.    The pinesnake SSA follows the Service's "SSA Framework." *See* U.S. Fish and Wildlife Serv., *USFWS Species Status Assessment Framework: An integrated analytical framework for conservation*, Version 3.4 (2016) [hereinafter "SSA Framework"]. In this framework, the Service evaluates a species' viability using the concepts of "resiliency," "representation," and "redundancy," known together as the "3Rs."

58.    The Service's not-warranted finding is, in multiple respects, arbitrary, capricious, and contrary to the best available science. Further, the Service applied an unlawful interpretation

of the ESA in its analysis of whether the pinesnake is endangered or threatened in a significant

portion of its range.

> **A.    The Service Contradicted Its Own Findings, Peer Reviewers, and the Best Available Science Showing That Highways are Significant Barriers to Pinesnake Movement.**

59.    The Service defined pinesnake populations as "contiguous areas surrounding

known Florida pinesnake occurrences with habitat conducive to survival, movement, and

interbreeding" among individual pinesnakes. SSA at 37. The Service acknowledged "the role that

roadways play in fragmenting habitat[,]" that "roads can effectively become barriers that divide

and isolate populations[,]" *id.* at 20, that "fragmentation by roads may be an impediment to

maintaining viable populations of snakes[,]" *id.*, and that several experts said road density is

highly influential to the survival and reproductive success of pinesnakes. Nevertheless, the

Service defined "populations" for the purposes of the SSA using groups of individuals who could

not possibly move amongst one another and interbreed because they are divided by highways or

interstates. Because populations are the fundamental building blocks of the Service's entire

viability analysis, the Service's finding that the pinesnake is not endangered or threatened is

therefore arbitrary, capricious, and contrary to the best available science.



Fig. 2: Florida Pinesnake SSA Populations and Highways



Fig. 3: Florida Pinesnake SSA Populations and Highways in Florida and Southern Georgia

60.    The Service stated that it "did not divide populations spanning . . . interstates (primary roads) as [it] felt that the size of this subspecies allowed for their movement across these barriers." *Id*. at 37. But the best available science and the Service's chosen expert peer-reviewers contradict the Service's "feelings." The Service itself acknowledged that "[p]inesnakes may be vulnerable to road mortality *due to* their large size." *Id*. at 21. Scientific studies cited by the Service also found that Florida pinesnakes avoid graded and paved roads, especially paved two-lane highways. One peer-reviewing scientist wrote, "I would be extremely surprised if any snake could survive an attempt to cross an interstate highway," and pressed the Service to

consider splitting populations "by large and even medium-sized roads, especially interstate highways."

61.    By lumping together "populations" intersected by highway barriers, the Service likely overestimated pinesnake population resiliency by overestimating key components of its resiliency measure: habitat suitability, protected land, and number of nearby populations. Populations with poor quality habitat or little protected land that are isolated by highways have likely been lumped into populations with better habitat and more protected land, thereby obscuring their vulnerability. Further, many populations have likely been counted as "near" each other—a categorization that increased their resiliency score—despite being isolated by highways.

**B.    The Service Failed to Model or Otherwise Address Many Future Threats to the Pinesnake that the Service Itself Identified.**

62.    The Service's not-warranted finding also failed to model or otherwise address many future threats to the Florida pinesnake's viability that the Service itself had identified.

63.    First, the Service did not analyze the impacts that road mortality might have on the pinesnake in the foreseeable future, despite acknowledging that the pinesnake's size, slowness, and daytime activity make road mortality a "leading" and "primary" threat. SSA at 20. The Service did not otherwise explain why this primary threat does not threaten the species with extinction.

64.    Nor did the Service's finding address the effects of predation from invasive fire ants, habitat disturbance from feral hogs, persecution and harassment from humans, death from fungal disease and invasive parasites, or climate change increasing the danger posed by drought, flooding, and storms, despite identifying each of these in the SSA as a threat to the pinesnake's future viability. The Service said that "the availability of data and our understanding of these

18

stressors' effects precluded their integration into the future persistence model," *id*. at 55, but it is arbitrary and contrary to the best available science for the Service to fail to otherwise consider these threats when explaining why the pinesnake is not threatened or endangered simply because they did not fit into the Service's preferred model. Under the ESA, uncertainty does not relieve the Service of its duty to rely on the best available science, and at the very least, the Service failed to rationally explain why it could not otherwise account for these threats. To take just one example, the Service could have discounted the viability of pinesnake populations due to predation from invasive fire ants by looking to publications before the agency that provided predation rates in other reptiles for guidance.

65.    Even so, the Service failed to model or otherwise address threats for which the agency *did* have data compatible with its model. For example, the Service did not analyze the threat of invasive cogongrass, despite citing to a dataset of cogongrass occurrences that could have been compatible with its habitat-based model.

**C.    The Service Evaluated Pinesnake Resiliency with a Model That Contradicts Its Own Definition of "Resiliency."**

66.    Another fundamental flaw in the Service's analysis is that it evaluated pinesnake "resiliency" by using a "current persistence probability model" that estimates *presence*, not resiliency. SSA at 37–38.

67.    "Resiliency" is one of the "3Rs" the Service used to characterize the pinesnake's viability, and in the Service's usage, it is "the ability [of a species] to sustain populations through the natural range of favorable and unfavorable conditions." *Id*. at 2. The Service evaluated the resiliency of individual pinesnake populations using a "current persistence probability" model it created. The Service's model defined "current persistence probability" as "the probability that there is at least one Florida pinesnake in 2021 in the defined area for that population." *Id*. at 38.

In the Service's model, the probability that there is "at least one pinesnake" in the population area is influenced by the number of pinesnake records from that area, habitat quality, the proportion of area occurring on protected land, and the number of nearby populations. Using these calculated probabilities, the Service classified each pinesnake population's resiliency as either "Extirpated" (< 50% chance that there is at least one snake on the landscape), "Low Resiliency" (50–79.9%), "Moderate Resiliency" (80–94.9%), and "High Resiliency" (95–100%).

68.     Of a total 133 historical pinesnake populations, the Service categorized 30.8% (41) of these populations as extirpated, 19.5% (26) as low resiliency, 27.8% (37) as moderate resiliency, and 21.8% (29) as high resiliency. *Id*. at 39. These estimates are the core of the Service's entire not-warranted finding, which framed the pinesnake's status in terms of the numbers of populations in each resiliency category.

69.     But the probability that there is "*at least one*" pinesnake present in a given population is not a measure of resiliency at all—because a single pinesnake does not have "the ability to sustain [a] population" by its lonesome self. *Id*. at 2. Accordingly, the Service's definition of "current persistence probability" ignores the best available science, which establishes the basic fact that Florida pinesnakes reproduce sexually in pairs.

70.     Instead, the Service arbitrarily confuses a prediction of whether a *single* pinesnake *is present* with a measurement of that population's resiliency. The Service's own explanation of how to assess resiliency also includes evaluating "abundance and the components of population growth rate—survival, reproduction, and migration" and "genetic health (effective population size and heterozygosity*). " Id*. at 2. Likewise, the framework the Service uses for its SSAs—and which the Service cited to for this SSA—explains that resiliency "is positively related to population size and growth rate" and "[g]enerally speaking, populations need *abundant*

*individuals* within habitat patches of adequate area and quality to maintain *survival and reproduction* in spite of disturbance." SSA Framework at 12. None of these essential aspects of resiliency are adequately measured by predicting whether a single snake still occupies an area. The Service said it needed to evaluate the pinesnake's resiliency to determine its status but instead tried to answer a different question altogether.

71.     As a result, the Service's model classifies 34 sightings of solitary pinesnakes as 34 separate, extant populations—constituting over a third of the Service's predicted remaining populations. As just one example of the arbitrary nature of this result, the Service classified as "extant" three populations that allegedly still occur based on single observations from *forty years* ago on land that has little to no legal protection.

72.     Further, because the Service uncritically incorporated this arbitrary definition of pinesnake resiliency into the other two of its "3Rs"—representation ("the number and distribution of *resilient populations* . . . across representative units") and redundancy ("the current number and distribution of *resilient populations* within representative units and across the [pinesnake's] range")—the rest of the Service's viability analysis is built on the same faulty foundation. SSA at 2–3.

73.     Scientists who peer-reviewed the SSA pointed out these flaws to the Service. One peer reviewer warned the Service that its analysis "relies over heavily" on a "largely unvalidated" model and pointed out that even though "resiliency has to do with population size and demography and habitat," "population size most definitely is not" a part of the model. Another questioned whether it was "too generous to assume that finding a single individual indicates population persistence." But the Service forged ahead without providing a rational explanation for ignoring these expert opinions.

**D.    The Service's "Significant Portion of Range" Analysis Contradicts the Service's Own Findings and Uses an Unlawful Interpretation of the ESA.**

74.    The Service also unlawfully analyzed the pinesnake's status in a "significant portion of its range." Under the ESA, a species is "endangered" if it is "in danger of extinction throughout all *or* a significant portion of its range," and "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all *or* a significant portion of its range." 16 U.S.C. § 1532(6), (20) (emphases added).

75.    In its analysis, the Service divided the pinesnake's range into seven "representative units": the Upper Coastal Plain, Upper Coastal Plain (Georgia/Florida), Atlantic Coastal Plain (Georgia/Florida), Alabama/Florida Panhandle, Florida Peninsula, Upper Alabama, and Atlantic Coastal Plain (Carolinas). The units were created by "grouping Environmental Protection Agency (EPA) Level IV ecoregions, sourced from an EPA database of different ecological regions, by similar ecological characteristics." SSA at 40.

76.    The Service found that the pinesnake is threatened in the Upper Alabama and Atlantic Coastal Plain (Carolinas) units because these populations may be extirpated as soon as 2060. But the Service claimed that this did not mean the pinesnake was threatened range-wide because neither of these Units were a "significant portion" of the pinesnake's range. The Service said the Units were not "significant" because they "do not contain high or unique value habitat for the subspecies or constitute an area of habitat that is essential to a specific life-history function for the subspecies that is not found in the remainder its range." SAF at 25.

77.    The Service's analysis contradicts its own findings about the significance of the Upper Alabama and Atlantic Coastal Plain (Carolinas) Units to the Florida pinesnake. The Service itself stated that these representative units "contribute to the conservation of the

subspecies in a biologically meaningful way," SAF at 24, and in light of this determination, the agency must explain why the loss of these units does not threaten the species' future viability.

78.     Furthermore, the Service's finding that the Upper Alabama and Atlantic Coastal Plain (Carolinas) units are not significant because they do not contain "unique value habitat" also contradicts its own analysis. The Service drew the boundaries of the representative units to encompass "similar ecological characteristics" using EPA Level IV ecoregion data, SSA at 40, and both units contain pinesnake populations that occur in unique ecoregions found nowhere else in the pinesnake's range. The Upper Alabama Unit is the only representative unit where pinesnake populations have been found in the Fall Line Hills ecoregion, and the Atlantic Coastal Plain (Carolinas) Unit contains the only populations occurring in the Carolina Flatwoods ecoregion. Yet the Service failed to acknowledge the significance of these unique habitats, much less rationally explain how losing them may impact the pinesnake's future viability.

79.     Finally, insofar as the Service's test requires that a representative unit be deemed significant only if it is "essential" to a specific life history function for the pinesnake, that test improperly conflates a species being threatened in a "significant portion of its range" with the species being "threatened throughout all of its range" 16 U.S.C. § 1532(20); indeed, if a species is threatened or endangered in a portion of its range that is *essential* to its life history, it is *de facto* threatened or endangered throughout *all* of its range, since without that portion no individual animal would be able to complete its life cycle.

## CLAIMS FOR RELIEF

### First Claim for Relief

### *Violation of the ESA and APA in Finding That Listing the Florida Pinesnake as an Endangered or Threatened Species Is Not Warranted*

80.    The Center realleges and incorporates by reference the preceding paragraphs.

81.    The ESA requires the Service to base its listing decisions "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

82.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)

83.    An agency action is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

84.    The Service's finding that listing the Florida pinesnake as an endangered or threatened species under the ESA is not warranted is unlawful because it defines populations in a way that contradicts its own findings and the best available science showing that highways are barriers to pinesnake movement; fails to address numerous threats to the pinesnake's viability in the foreseeable future identified by the best available science and the Service itself; and contradicts the Service's own definition of resiliency and the best available science on pinesnake reproduction by evaluating resiliency as the probability that a single pinesnake is present.

**Second Claim for Relief**

***Violation of the ESA and APA in Finding That Listing the Florida Pinesnake as an
Endangered or Threatened Species in a Significant Portion of its Range Is Not Warranted***

85. The Center realleges and incorporates by reference the preceding paragraphs.

86. Under the ESA, a species is "endangered" if it is "in danger of extinction" in "a significant portion of its range," and it is "threatened" if it "is likely to become an endangered species within the foreseeable future" in "a significant portion of its range." 16 U.S.C. § 1532(6), (20).

87. The Service's finding that the Florida pinesnake is not endangered or threatened in a significant portion of its range is unlawful because it contradicts the Service's own findings about the significance of the portions of the pinesnake's range that the species will be extirpated from. The Service's finding is further unlawful insofar as its test for significance relies on an unlawful conflation of the ESA's standards for a species that is threatened in a "significant portion of its range" with one that is "threatened throughout all of its range."

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Declare that Defendants' not-warranted finding for the Florida pinesnake violates the ESA and APA as alleged herein;

(2) Set aside and vacate Defendants' not-warranted finding;

(3) Remand the not-warranted finding to Defendants for further analysis and a new listing determination, issued by a date certain, that is consistent with the ESA, APA, and this Court's order;

(4) Award Plaintiff reasonable attorneys' fees, costs, and expenses associated with this action; and

(5)     Grant Plaintiff such further and additional relief as the Court may deem just and proper.


DATE: August 7, 2025

Respectfully submitted,

/s/ Chelsea Stewart-Fusek
Chelsea Stewart-Fusek
D.C. Bar No. OR0029
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
Phone: (971) 717-6425
cstewartfusek@biologicaldiversity.org

/s/ Elise Pautler Bennett
Elise Pautler Bennett
D.C. Bar No. FL0018
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 755-6950
Fax: (520) 623-9797
ebennett@biologicaldiversity.org